* * * * * * * * * * *
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Donovan and the briefs and arguments before the Full Commission. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence or rehear the parties or their representatives. The Full Commission AFFIRMS with some modifications the Opinion and Award of the Deputy Commissioner.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matter of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The date of the admittedly compensable injury by accident is January 19, 2004.
2. Defendants filed a Form 60 dated April 19, 2004, admitting plaintiff's right to compensation for an injury by accident on January 19, 2004 to his right knee and commencing temporary total disability benefits effective April 13, 2004.
3. On August 23, 2004, plaintiff returned to work for defendant-employer at reduced wages.
4. Defendants filed Form 28Ts dated October 27, 2004 and December 2, 2004, documenting that plaintiff returned to work on August 23, 2004 at reduced wages.
5. On April 14, 2005, plaintiff was terminated from his employment with defendant-employer.
6. Plaintiff's average weekly wage is $646.24, yielding a compensation rate of $430.85 per week.
7. Prior to the admittedly compensable injury by accident that is the subject of this claim, plaintiff sustained another compensable injury on September 11, 1998, resulting in injuries to his right leg and left leg. As a result, defendants paid plaintiff $19,371.00 on or about March 8, 2002, pursuant to a Form 21 agreement approved by the Industrial Commission.
8. On January 19, 2004, the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
9. On January 19, 2004, an employer-employee relationship existed between the parties and defendant-employer employed three or more employees.
10. Brentwood Services is the servicing agent for workers' compensation insurance in North Carolina for defendant-employer.
11. The parties stipulated medical records into evidence as Stipulated Exhibit #1.
12. The following were admitted into evidence at the Deputy Commissioner's hearing:
a. Plaintiff's Exhibit #1: Medical records (included in stipulations)
b. Plaintiff's Exhibit #2: Tape of voice mail (transcript)
c. Plaintiff's Exhibit #3: Pay stub from plaintiff's current employment
d. Plaintiff's Exhibit #4: Interrogatories
e. Plaintiff's Exhibit #5: Job description dated July 9, 2004
f. Defendants' Exhibit #1: Interrogatories
g. Defendants' Exhibit #2: Termination form
13. Subsequent to the Deputy Commissioner's hearing, the parties submitted the following additional stipulated facts:
a. On July 18, 2005, plaintiff returned to work with Nourse Auto Mall.
b. For the pay period ending September 27, 2005, plaintiff earned gross wages with Nourse Auto Mall in the amount of $2,670.33.
14. The issues before the Full Commission are whether defendant-employer provided plaintiff with suitable employment following his return to work, whether plaintiff's termination was related to his compensable injury by accident, whether plaintiff is entitled to an additional 10% permanent partial disability rating, and what benefits, if any, plaintiff is entitled to receive.
 * * * * * * * * * * *
Based upon the competent evidence of record herein, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the Deputy Commissioner's hearing, plaintiff was 42 years old. He began his employment with defendant-employer in November 1993 in the shipping and receiving department and, in 1996, moved to the parts counter as a sales clerk. As a parts sales clerk, plaintiff's workstation area contained four seating areas, each approximately two or three feet apart. The duties of a parts sales clerk included answering calls from customers, looking up information on the computer, and providing customers with costs, if requested. These duties were performed from a seated position at the counter. For the sale of a part, the parts sales clerk was also required to physically find the part in one of 3 warehouse locations, carry the part back to the counter, and transact the sale of the part.
2. Prior to his injury by accident on January 19, 2004, plaintiff sustained a compensable injury by accident on September 11, 1998, resulting in injuries to his right leg. Plaintiff's injury was treated by Dr. Ronald L. Singer, who first performed surgery on his right knee on October 29, 1998, consisting of arthroscopy right knee with partial lateral meniscectomy and chondroplasty lateral femoral condyle. Dr. Singer performed a second surgery on August 16, 1999, consisting of arthroscopy right knee with arthroscopic lateral release, arthroscopic synevectomy right knee, and chondroplasty left femoral condyle with microfractionation. In March 2000, Dr. Singer assigned plaintiff a 20% permanent partial disability rating to the right leg. Defendant paid plaintiff benefits pursuant to an Industrial Commission Form 21, which was approved on March 8, 2002.
3. On March 1, 2000, plaintiff saw Dr. Singer for his right knee, in connection with his September 11, 1998 injury by accident. Thereafter, he returned to his pre-injury employment with defendant-employer selling parts and he remained in that job until his injury by accident on January 19, 2004.
4. On January 19, 2004, plaintiff sustained an injury by accident to his right knee arising out of and in the course and scope of his employment with defendant-employer when his left foot caught in the wheel of a hand truck, which caused him to miss a step and his right knee buckled. Defendant admitted the compensability of the accident and paid all related medical expenses on plaintiff's behalf.
5. Following the January 19, 2004 accident, plaintiff was again evaluated by Dr. Singer, who diagnosed plaintiff with a meniscus tear and early degeneration of the lateral compartment of the knee. On April 13, 2004, Dr. Singer performed a third right knee arthroscopy consisting of right knee arthroscopy with partial lateral meniscectomy and chondroplasty, lateral femoral condyle.
6. On May 20, 2004, Dr. Singer authorized plaintiff to return to work with restrictions of sit-down work only, although plaintiff did not return to work at that time. On June 21, 2004, Dr. Singer again authorized plaintiff to return to work with the same restrictions.
7. On July 7, 2004, plaintiff returned to work. Ed Mills, parts manager, returned plaintiff to his pre-injury job as parts sales clerk. Plaintiff, however, felt that as a parts sales clerk, he was repeatedly required to exceed the restrictions imposed by Dr. Singer. On July 13, 2004, plaintiff called Dr. Singer and complained of having to get up more than 52 times in a three-hour period. Dr. Singer issued additional restrictions for plaintiff of no lifting, pushing or pulling more than 10 pounds, no bending, kneeling, stooping or squatting, performing sit-down work only, no stair or ladder climbing, and a limit of getting up no more than four times per hour to pull parts.
8. On August 2, 2004, plaintiff again called Dr. Singer's office and indicated that defendant-employer was requiring him to retrieve parts 40 to 50 times per shift. Dr. Singer removed plaintiff from work, pending a re-evaluation.
9. On August 20, 2004, Dr. Singer issued another work status form relating the same restrictions. Plaintiff returned to work on August 23, 2004, but continued to complain that his duties required him to perform tasks outside the restrictions imposed by Dr. Singer. Specifically, plaintiff complained that he was required to retrieve parts frequently, greatly exceeding the limit of getting up four times per hour.
10. On July 9, 2004, Mr. Mills prepared a job description for plaintiff's position, which states that, on average, the position requires the employee to pick parts 10 to 15 times per hour. Mr. Mills also testified that when he received plaintiff's restrictions, he requested other employees to assist plaintiff when he needed to retrieve a part.
11. Plaintiff and his co-workers were paid on a commission basis related to the parts they individually sold. Accordingly, plaintiff's co-workers received no compensation when they assisted plaintiff, and, in fact, they lost time in which they could be earning their own commissions. Therefore, the Commission finds that there was a financial disincentive for plaintiff's co-workers to help plaintiff retrieve parts. Plaintiff estimated that he received help only 25% of the time and had to retrieve the parts 75% of the time. The Commission finds plaintiff's testimony regarding the lack of assistance provided by co-workers and the frequency of his retrieval of parts to be credible.
12. Following his return to work on August 23, 2004 and until his termination on April 14, 2005, plaintiff repeatedly complained to defendant-employer, case manager Beverly Hansbrough, Dr. Singer and his nurse, and Sandy Hartis, adjuster with Brentwood Services, regarding defendant-employer's failure to accommodate his restrictions.
13. Following plaintiff's complaints about the job duties and at the request of defendant, on September 9, 2004, Veronica Pressley, vocational case manager, observed plaintiff for one and a half hours while he performed the parts sales clerk job. Ms. Pressley prepared a written job analysis based on her observations. The analysis and her testimony revealed that plaintiff was required to stand up to perform work-related duties three times during the one and a half hour observation period. Plaintiff voluntarily stood up one other time to retrieve a snack, but this action was not related to or required by the position of employment.
14. Plaintiff alleges that Ms. Pressley's observation occurred during a period of unusually slow business at defendant-employer and that one and one half hours does not suffice to gain an accurate impression of the physical demands of the job. Ms. Pressley testified that based on her training and education, she determined when the best observation period would be to represent the usual work routine. Ms. Pressley concluded that due to the repetitive nature of the job, her observation period was sufficient to gain an accurate impression of the physical demands of the parts sales clerk position.
13. The Commission gives greater weight to plaintiff's testimony and to the job description prepared by Mr. Mills, based upon his more than 20 years experience as a parts supervisor, that stated that the parts sales clerk job required an employee to pick parts 10 to 15 times per hour, over the estimate provided by Ms. Pressley. In addition, based upon the greater weight of the evidence, the Commission finds that the job of parts sales clerk provided by defendant-employer was not reasonably within plaintiff's return to work restrictions and did not constitute suitable employment.
16. Plaintiff returned to Dr. Singer on October 1, November 17, and December 20, 2004, with complaints of being required to exceed his restrictions in the performance of his job. On each occasion, Dr. Singer re-issued the same restrictions he imposed when plaintiff returned to work on August 23, 2004.
17. On January 19, 2005, plaintiff presented to Dr. Singer, who imposed permanent restrictions on plaintiff of no standing up more than four times per hour, no lifting greater than 30 pounds, occasional stair climbing with no squatting, stooping, kneeling or repetitive bending, and no standing more than 30 minutes. Dr. Singer also assigned plaintiff a permanent partial disability rating of 20% to the right leg, the same rating he had assigned after the second surgery and before the January 19, 2004 accident. In his deposition, Dr. Singer stated that the January 19, 2004 accident and resulting surgery had little effect on plaintiff's underlying arthritic condition and that plaintiff's degree of disability had not increased.
18. On or about March 7, 2005, plaintiff began experiencing numbness in his left arm and made arrangements to be seen at the Miller Orthopaedic Clinic. On March 15, 2005, plaintiff was seen by Ken Reardon, physician's assistant, who took plaintiff out of work. Mr. Mills testified that he received notice that plaintiff would be out of work from March 15, 2005 through April 5, 2005. Plaintiff also spoke to Mr. Mills on March 18, 2005 and informed him of his condition, his need to have a CT scan, and his follow up appointment on April 6, 2005.
19. Following his April 6, 2005 appointment, plaintiff was again written out of work through April 21, 2005. Plaintiff stated that the Miller Orthopaedic Clinic informed him that they would fax the out-of-work note to his employer. Plaintiff also states that on April 8, 2005, he left a message for Mr. Mills with co-worker Ray Kimbrell, regarding plaintiff's need for additional time out of work. Mr. Mills testified that he did not receive the additional notice either from the clinic or from plaintiff, and there is no testimonial or documentary evidence to the contrary.
20. On April 14, 2005, Mr. Mills received a fax from the Miller Orthopaedic Clinic informing him that plaintiff could return to work on April 21, 2005. Thereafter, Mr. Mills left plaintiff a voicemail message stating that he had not heard from plaintiff since March 18, 2005, and that as a result, plaintiff had been terminated as of April 8, 2005 for failure to timely inform defendant-employer of his absences.
21. The Commission finds that defendant has met the burden of showing that plaintiff's termination from employment was the result of a wrongful act of misconduct for which any non-disabled employee would have been terminated.
22. Following his termination by defendant-employer, plaintiff looked for work but remained out of work until July 18, 2005, when he obtained a job with Nourse Auto Mall. Plaintiff earned a total of $2,730.33 with this new employer through the pay period ending September 27, 2005.
23. On August 24, 2005, plaintiff presented for an independent medical evaluation conducted by Dr. Jerry Barron, orthopedist. Following the evaluation, Dr. Barron assigned plaintiff a 30% permanent partial disability rating to the right leg, based upon his examination of plaintiff and his medical records. Dr. Barron noted that he did not examine plaintiff prior to the third surgery and that it would be "very difficult to separate" plaintiff's injuries. However, he stated that his additional 10% rating over Dr. Singer's 20% rating related to plaintiff's third injury. Dr. Barron further clarified that Dr. Singer's 20% was not incorrect; it was just a differing opinion. Dr. Barron opined that there are lots of variables in determining the range of permanent partial disability that would result from the type of surgery plaintiff had on April 13, 2004, and that that type of surgery could potentially cause greater problems and disability for plaintiff.
24. The Commission gives greater weight to the opinions and permanent partial disability rating of Dr. Singer rather than Dr. Barron, as Dr. Singer was plaintiff's treating physician and performed all three surgeries on plaintiff's knee.
 * * * * * * * * * * *
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. Plaintiff sustained an injury by accident to his right knee arising out of and in the course of the employment on January 19, 2004. N.C. Gen. Stat. § 97-2(6).
2. Plaintiff returned to work as a parts sales clerk for defendant-employer on July 7, 2004. However, the position was not suitable employment, as it required plaintiff to perform tasks outside of the restrictions imposed by Dr. Singer. Accordingly, plaintiff's termination by defendant-employer on April 14, 2005 did not constitute a constructive refusal of suitable employment. N.C. Gen. Stat. § 97-32;Seagraves v. Austin Co. of Greensboro, 123 N.C. App. 228, 472 S.E.2d 587
(1996).
3. As a result of the January 19, 2004 compensable injury by accident, plaintiff has been disabled from work since April 13, 2004. Plaintiff is entitled to receive compensation for temporary total disability at the rate of $430.85 per week beginning April 13, 2004 and continuing until he began his employment with Nourse Auto Mall on July 18, 2005, subject to a deduction for payments already made by defendant and wages earned by plaintiff during the period he worked for defendant-employer in the job that was not suitable employment. N.C. Gen. Stat. §§ 97-2(6); 97-29.
4. Plaintiff is entitled to temporary partial disability compensation equal to two-thirds of the difference between his pre-injury average weekly wage and his wages upon returning to work for Nourse Auto Mall beginning on July 18, 2005 and continuing for a maximum of 300 weeks from January 19, 2004. N.C. Gen. Stat. § 97-30.
5. Dr. Singer assigned plaintiff a 20% permanent partial disability rating to his right knee as a result of the injury by accident on January 19, 2004. As plaintiff has already been paid the permanent partial disability compensation due as a result of the 20% rating, there is no additional compensation due to plaintiff pursuant to N.C. Gen. Stat. § 97-31.
6. Plaintiff is entitled to have defendant pay for medical expenses incurred or to be incurred as a result of the compensable injury as may be required to provide relief, effect a cure or lessen the period of disability, subject to the limitation in N.C. Gen. Stat. § 97-25.1. N.C. Gen. Stat. § 97-2(19).
 * * * * * * * * * * *
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission enters the following:
 AWARD
1. Subject to the attorney's fee approved below, defendant shall pay to plaintiff temporary total disability compensation at the rate of $430.85 per week beginning April 13, 2004, and continuing through July 18, 2005. Defendant is entitled to a deduction for all benefits already paid and wages received by plaintiff. Amounts that have accrued shall be paid to plaintiff in a lump sum.
2. Subject to a reasonable attorney's fee approved below, defendant shall pay to plaintiff temporary partial disability compensation equal to two-thirds of the difference between his pre-injury average weekly wage and his wages upon returning to work for Nourse Auto Mall beginning on July 18, 2005 and continuing for a maximum of 300 weeks from January 19, 2004. Amounts that have accrued shall be paid to plaintiff in a lump sum.
3. A reasonable attorney's fee of 25% of the compensation awarded to plaintiff in paragraphs 1 and 2 above is hereby approved to be deducted from sums due plaintiff and paid directly to counsel as follows: 25% of the lump sums due plaintiff shall be deducted and paid directly to plaintiff's counsel. Thereafter, every fourth compensation check shall be paid directly to plaintiff's counsel.
4. Defendant shall pay all related medical expenses incurred or to be incurred by plaintiff as the result of his injury by accident, for so long as such examinations, evaluations and treatments may reasonably be required to effect a cure, give relief or tend to lessen plaintiff's period of disability.
5. Defendant shall pay the costs.
This 23rd day of October, 2006.
S/_______________________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/__________________________________ THOMAS J. BOLCH COMMISSIONER
 S/__________________________________ CHRISTOPHER SCOTT COMMISSIONER